

**The following constitutes**
**the order of the court. Signed August 6, 2012**

_____
**Charles Novack**
**U.S. Bankruptcy Judge**

## UNITED STATES BANKRUPTCY COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re: | Case No. 08-52709 CN |
| CEDAR FUNDING, INC., | Chapter 11 |
| Debtor(s). | |

| | |
|---|---|
| ULTIPRF, LLC, | Adversary No. 09-5173 |
| Plaintiff, | |
| vs. | MEMORANDUM DECISION FOLLOWING TRIAL |
| R. TODD NEILSON, Trustee of the Chapter 11 Estate of Cedar Funding, Inc., Debtor, | |
| Defendant. | |

R. TODD NEILSON, in his capacity as Chapter 11 Trustee of the Estate of Cedar Funding, Inc.,

      Counterclaimant,

vs.

ULTIPRF, LLC,

      Counter-defendant

**UNITED STATES BANKRUPTCY COURT**
**For The Northern District Of California**

1

## INTRODUCTION

ULTIPRF, LLC ("Plaintiff") filed this adversary proceeding on July 8, 2009 to enjoin a trustee's sale and to recover damages against the bankruptcy estate for a) the debtor and the bankruptcy estate's failure to reconvey deed of trusts against Plaintiff's real property b) the debtor's pre-petition failure to timely provide payoff demands, and c) the bankruptcy estate's unauthorized attempts to foreclose on Plaintiff's real property (the pertinent parcels of which are located in Monterey, California). Plaintiff asserted numerous claims for relief against Chapter 11 trustee R. Todd Neilson (the "Trustee")[1], including claims for contract reformation, injunctive relief to quiet title in certain property, and for damages under California Civil Code § 2943(e)(4), California Civil Code § 2941(d), and for slander of title. The Trustee answered the complaint and asserted counterclaims seeking reformation of the promissory notes secured by the real property in question and authorization to judicially foreclose on the deeds of trust. This court granted Plaintiff's motion for a preliminary injunction on September 3, 2009 which enjoined the Trustee from conducting the trustee's sales. The Trustee rescinded its notice of trustee sale on November 3, 2009.

The parties filed a joint pre-trial statement on October 10, 2011, which recited the undisputed facts, the disputed facts, and the claims for relief and affirmative defenses at issue. Pursuant to F.R.B.P. 7016, the joint-pre trial statement superseded all previous pleadings in this adversary proceeding.[2]

On February 27 and 28, 2012, this court conducted a trial in this adversary proceeding. The parties consented to this court making findings of fact and entering a final judgment. During trial, the Trustee dismissed his counter-claim for judicial foreclosure. Accordingly, the following constitutes this court's findings of fact and conclusions of law under Federal Rule of Bankruptcy Procedure 7052(a).

---

[1] This court confirmed a chapter 11 plan of reorganization in February 2011, and Russell K. Burbank was appointed as the Plan Administrator, effectively replacing R. Todd Neilson as the individual responsible for the administration of the chapter 11 plan. Burbank was the real party defendant and counter-claimant when this court tried this adversary proceeding. Burbank and Neilson shall collectively be referred to as the "Trustee."

[2] Plaintiff never filed a claim in Cedar Funding's Chapter 11 case. The Trustee did not raise this as an affirmative defense in his answer or in the joint-pre-trial statement, thereby waiving his right to assert this defense.

2

# FACTS

## THE PURCHASE OF THE UNDEVELOPED LOTS

In 2002, Carol Frederick ("Frederick") began negotiations to purchase two undeveloped parcels in the Del Monte Beach subdivision of Monterey County. Local planning authorities and the California Coastal Commission had imposed various conditions on developing the land for residential housing, and the subdivision's development had been stalled for over 25 years. The design and construction costs of satisfying these conditions were to be borne by the ultimate developer of the subdivision. Frederick formulated a plan for developing the subdivision consistent with these regulatory requirements. On December 30, 2003, before the regulatory authorities accepted her subdivision development plans, Frederick purchased twelve undeveloped lots in the subdivision (the "Lots" or the "Property"). On June 30, 2004, using Frederick's planning blueprint as a guide, the City of Monterey converted Del Monte Beach into the subdivisions now known as Monterey Shores Estate and Dunecrest Villas (known as tract 1421 and 1422, respectively, in the official county records). After this conversion, nine of the Lots were located in Monterey Shores and three in Dunecrest Villas.

Frederick financed the purchase and development of the Property through a series of four loans from Cedar Funding (the "Loans"). Some of the loans were secured by all of the Lots, while others only encumbered a single Lot. On August 2, 2007, Frederick conveyed all her interest in the Property to ULTIPRF LLC.[3] Below is a chart linking the four Loans with their and related Deeds of Trust to the individual Lots as of December 30, 2003.

| Street Address | Lot Number | Loan Numbers | Deed of Trust Number |
|----------------|------------|--------------|----------------------|
| 205 Dunecrest | 3 | Loan 1, Loan 2 | DOT 1, DOT 2 |
| 207 Dunecrest | 2 | Loan 1, Loan 2, Loan 4 | DOT 1, DOT 2, DOT 4 |
| 209 Dunecrest | 1 | Loan 1, Loan 2, Loan 3 | DOT 1, DOT 2, DOT 3 |

---

[3] Plaintiff is wholly owned, operated, managed by Frederick. Although a significant portion of the conduct and transactions described herein occurred when Frederick owned the Property, the Trustee never argued that Frederick is the real plaintiff party-in-interest.

3

| | | | |
|---|---|---|---|
| 6 Spray[4] | 8 | Loan 1, Loan 2 | DOT 1, DOT 2 |
| 7 Spray | 6 | Loan 1, Loan 2 | DOT 1, DOT 2 |
| 9 Spray | 5 | Loan 1, Loan 2 | DOT 1, DOT 2 |
| 15 Spray | 3 | Loan 1, Loan 2 | DOT 1, DOT 2 |
| 16 Spray | 9 | Loan 1, Loan 2 | DOT 1, DOT 2 |
| 17 Spray | 2 | Loan 1, Loan 2 | DOT 1, DOT 2 |
| 18 Spray | 10 | Loan 1, Loan 2 | DOT 1, DOT 2 |
| 20 Spray | 11 | Loan 1, Loan 2 | DOT 1, DOT 2 |
| 22 Spray | 12 | Loan 1, Loan 2 | DOT 1, DOT 2 |

## LOAN 4768

Cedar Funding funded Loan #4768 ("Loan 1") on December 30, 2003. Loan 1 was evidenced by a $2.5 million promissory note secured by a first deed of trust ("DOT 1") against all twelve Lots. Frederick used the Loan 1 proceeds to finance the purchase of the Lots. Plaintiff and the Trustee disputed the basic terms of Loan 1. While Loan1 states that it is a one year note at 14% interest, Plaintiff argued that David Nilsen, Cedar Funding's principal, represented that Loan1 was for two years at 13% interest.

Frederick drew down $1,500,000 of Loan 1 on December 31, 2003 and an additional $650,000 on June 11, 2004. Even though Frederick only borrowed $2,150,000 of Loan 1 (i.e., less than the note's face amount), Cedar Funding charged interest against the full face value of Loan 1.

On September 7, 2005, Cedar Funding imposed an $80,000 extension fee against Loan 1, and deducted this amount from Loan 2 (as defined below), presumably because Cedar Funding believed that Plaintiff had fully drawn down Loan 1. Cedar Funding charged additional Loan 1 extension fees of $40,210 on November 27, 2006, $44,039.42 on April 29, 2007, and $41,131.80 on January 25, 2008 (collectively, with the September 7, 2005 fee, the "Extension Fees"). The Extension Fees accrued interest and substantially increased the Loan 1 balance. The Trustee contended that as of May 1, 2009,

---

[4] Sometime on or around June 2007, Frederick and Cy Bram (together with Joel Kass, the parties who sold the Property to Frederick in 2003), swapped 6 Spray (Lot 8) for 5 Spray (Lot 7).

4

Case: 09-05173    Doc# 134    Filed: 08/06/12    Entered: 08/06/12 16:54:41    Page 4 of 22

1    Plaintiff owed  $2,192,546.21 under Loan 1.

2

3    **LOAN 4878**

4        Cedar Funding issued Loan #4878 ("Loan 2"), a $1.5 million note, on May 13, 2004.  On its face,

5    Loan 2 was a one year note at 14% interest.  Frederick contended, however, that just like Loan 1, Cedar

6    Funding represented to her that Loan 2 was a two year, 13% obligation. Frederick used the Loan 2

7    proceeds to pay the costs associated with the various Monterey County subdivision requirements and

8    to fund sewage, water and electrical improvements for the Lots. Loan 2 was secured by a blanket second

9    deed of trust against all of the Lots ("DOT 2").  Cedar Funding's records indicate that Frederick drew

10   down $968,753 against Loan 2.   Just as with Loan 1, Cedar Funding charged interest on the full face

11   amount of Loan 2 rather than against the actual amount drawn.   In addition, Cedar Funding increased

12   the Loan 2 balance by the September 7, 2005 extension fee associated with Loan 1.  Cedar Funding's

13   records indicate that Plaintiff fully repaid Loan 2 on October 18, 2005.  Cedar Funding did not, however

14   immediately reconvey DOT 2.

15

16   **LOAN 5476**

17       Cedar Funding issued Loan #5476 ("Loan 3"),a $600,000 note, on February 5, 2007.  Frederick

18   used the Loan 3 proceeds to construct a residence at 209 Dunecrest.  Loan 3 was secured by a deed of

19   trust against 209 Dunecrest ("Note 3") that was junior to DOT 1.  On its face, Loan 3 was a five year

20   note that carried a 14% interest rate.  Cedar Funding's records indicate that it disbursed $747,000.00 on

21   Loan 3.  Plaintiff contends that she only borrowed the face amount, and that the note was for a single

22   year at 13%.  The Trustee claimed that as of June 2009, the Loan 3 balance was $1,057,062, which

23   included the full principal amount of the loan, interest on principal, amounts drawn in excess of the

24   principal amount, and related interest and fees.

25

26   **LOAN 5513 AND THE SALE OF 207 DUNECREST**

27       Cedar Funding issued the final note in question, Loan #5513 ("Loan 4," and together with Loans

28   1, 2, and 3, the "Loans") on April 2, 2007 in the face amount of $650,000.  Plaintiff used the loan

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

5

1   proceeds to construct a single family residence at 207 Dunecrest.  Loan 4 was secured by a junior deed

2   of trust against 207 Dunecrest ("DOT 4," and, together with DOTs 1, 2, and 3, the "Deeds of Trust").

3   Plaintiff claims that Frederick only drew down $529,898 of Loan 4, while Cedar Funding's records

4   indicate that it disbursed $575,609.  In December 2007, Plaintiff sold 207 Dunecrest for $1,700,000.

5   This sale fully repaid Loan 4, and $522,112.42 of the sales proceeds were also applied against the Loan

6   1 balance.

8   **THE LOANS 1 & 2 PAYOFFS AND RECONVEYANCE SCHEME**

9   While Loans and DOTs 1 and 2 do not, on their face, provide for partial reconveyances of the

10  deeds of trust, documents introduced at trial and Frederick's testimony demonstrated that Cedar Funding

11  agreed to partially reconvey DOTs 1 and 2 upon receipt of $450,000.00 payments per Lot.

12  Beginning in the summer of 2005, Frederick partially refinanced Loans 1 and 2 to release 6

13  Spray, 7 Spray, 15 Spray, 16 Spray, and 17 Spray from DOTs 1 and 2. On July 7, 2005, Stewart Title

14  Company (the escrow company responsible for these refinances) issued two $450,133.00 checks[5] to

15  Cedar Funding to release 7 Spray and 15 Spray from DOTs 1 and 2.  On August 17, 2005, Stewart Title

16  issued another $450,133.00 to Cedar Funding, this time to release 17 Spray from DOTs 1 and 2.[6]

17  Finally, on October 18, 2005, Stewart Title issued two additional $450,133.00 checks to Cedar Funding

18  to release 6 Spray and 16 Spray from DOTs 1 and 2.  Cedar Funding never recorded any of the promised

19  reconveyances against 7 Spray, 15 Spray, and 17 Spray from DOTs 1 and 2 (the "Non-Reconveyed

20  Properties").[7]    As discussed in greater detail below, the Trustee ultimately recorded partial

22      [5]  The additional $133.00 represented Cedar Funding's escrow demand fee.

23      [6]  Although the Trustee disputes that these payments represented "payoff amounts" designed
24  to trigger partial reconveyances of DOTs 1 and 2, he does not dispute that Cedar Funding received
    these funds.

26      [7]  It appears that Cedar Funding did not record reconveyances releasing 16 Spray from DOT 1
    and 2 until May 18, 2008.  *See* Def's Exhibits HL, HN.  Plaintiff, however, did not raise an argument
27  in its pleadings or at trial that it suffered any harm by the delayed reconveyance.  In fact, Frederick
    testified at trial that of the five properties included in the June-October 2005 refinancing, only 7
28  Spray, 15 Spray, and 17 Spray were not reconveyed.

reconveyances of DOT 1 against 7 Spray, 15 Spray, and 17 Spray on November 3, 2009, more than four years after the $450,133.00 payments.[8]

### THE FAILED REFINANCING

After the sale of 207 Dunecrest in December 2007 and the 2005 partial refinancing, Plaintiff believed that only DOT 1 encumbered 205 Dunecrest, 209 Dunecrest, 9 Spray, 18 Spray, 20 Spray and 22 Spray (as noted above, Cedar Funding agreed but failed to partially reconvey DOT 1 against 7 Spray, 15 Spray, and 17 Spray). In December 2007, Plaintiff opened an escrow with Stewart Title to refinance the remaining balanced due on Loans 1 and 3. In response, Cedar Funding sent a $2,086,754.41 Loan 1 payoff demand to Stewart Title on December 11, 2007. This demand significantly exceeded the actual Loan 1 balance, and Cedar Funding apparently informed Plaintiff that it would issue a corrected payoff demand for Loan 1 in the amount of $1,549,000. Cedar Funding never sent a corrected Loan 1 payoff demand to Stewart Title, and never provided Stewart Title with any payoff demand for Loan 3.

By February of 2008, Plaintiff had obtained financing commitments of $1,900,000[9] to refinance Loans 1 and 3. These refinances would release 205 Dunecrest, 209 Dunecrest, 9 Spray, 18 Spray, 20 Spray, and 22 Spray (the "Refinancing Properties") from DOTs 1 and 3. Although Stewart Title made numerous requests to Cedar Funding for Loans 1 and 3 payoff demands, Cedar Funding never provided payoff demands after its initial, erroneous Loan 1 payoff demand in December 2007. The Stewart Title refinance escrows therefore did not close, and Cedar Funding thereafter filed its Chapter 11 bankruptcy on May 26, 2008.

---

[8] The Trustee was prepared to record reconveyances releasing 7 Spray, 15 Spray, and 17 Spray from DOT 2 in October of 2009, but refrained from doing so at Plaintiff's request. (Trial Tr. 363:1-20, 364:1-8 (Feb. 28, 2012)).

[9] The $1.9 million commitment included substantial fees and impounded interest amounts. The net funds available to satisfy Loans 1 and 3 was approximately $1,482,000. (Trial Tr. 128-134 (Feb. 27, 2012)). Accordingly, it is questionable whether Plaintiff could have fully refinanced Loans 1 and 3.

Case: 09-05173    Doc# 134    Filed: 08/06/12    Entered: 08/06/12 16:54:41    Page 7 of 22

**THE FRUSTRATED SALE ATTEMPTS**

In the fall of 2008, Plaintiff completed construction of the 7 Spray and 17 Spray residences. Plaintiff also designed a home for 15 Spray and ultimately marketed this Lot together with the building plans. Plaintiff claims that at some point between June 2008 and October 2008, it executed a contract to sell 15 Spray for $2.75 million (no sales contract was introduced into evidence). Plaintiff claims that the sale did not close when the prospective purchaser learned that DOTs 1 and 2 still encumbered the property.

Plaintiff also testified that she had a contract to sell 7 Spray for $3,325,000 in or around April 2009 (as with the purported sale of 15 Spray, no sales contract was introduced into evidence). This sale also did not close due to the continuing encumbrances of DOTs 1 and 2. Plaintiff never sold the Non-Reconveyed Properties, and these properties were lost to foreclosures or through surrenders to non-Cedar Funding lenders.

**THE FAILED SETTLEMENT AND NOTICES OF DEFAULT**

Cedar Funding filed its Chapter 11 bankruptcy on May 26, 2008, and the Trustee was appointed by this court in June 2008. On July 15, 2008, the Trustee issued a $2,283,730.05 Loan 1 payoff demand to Stewart Title. The Trustee's payoff demand was based on his best estimate after examining Cedar Funding's books and records. Cedar Funding's accounts were in shambles, and the Trustee spent significant time and estate funds on a forensic accounting. Shortly thereafter, the Trustee's real estate advisor met with Dennis Law, Plaintiff's then counsel, to reconcile the parties' significant dispute regarding the amounts due under Loans 1 and 3 (which would have allowed the chapter 11 bankruptcy estate to recover two of its largest receivables). These negotiations were unsuccessful, and the Trustee subsequently served and recorded Notices of Default to enforce the bankruptcy estate's deeds of trust against certain of the Lots.[10]

---

[10] During trial, Plaintiff objected to the Trustee's attempt to introduce into evidence documents and correspondence detailing the parties' effort to resolve the loan balances. (Def's Exhibits. EP, EQ, ER, ES, EV, EW, EX, EY, EZ, FA, FB, FC, FD, FF, FG, FL, FM). Federal Rule of Evidence 408(a)(2) provides that evidence of "conduct or a statement made during compromise

On March 6, 2009, the Trustee recorded a notice of default on Loan 1 alleging that as of February 1, 2009, the Loan 1 balance was $2,449,145.30.[11]  On May 7, 2009, the Trustee recorded an amended notice of default alleging that as of May 1, 2009, the Loan 1 balance was $2,192,546.21.  On March 6, 2009 the Trustee recorded a notice of default alleging that as of February 1, 2009, $383,103.98 was due on Loan 3.  On June 18, 2009, the Trustee recorded a notice of trustee's sale against 209 Dunecrest, alleging that the unpaid balance was $1,071,642.16 (the trustee's sale was scheduled for July 16, 2009).

On November 3, 2009, the Trustee rescinded the notices of default relating to Loans 1 and 3, and recorded reconveyances of DOT 1 against the Non-Reconveyed Lots.[12]

**LOAN 1 BALANCE**

The Trustee's expert witness, Nicholas Troszak ("Troszak"), a consultant with LECG, the forensic accountants employed by the Trustee to decipher Cedar Funding's books and records, testified regarding the amount due under Loan 1.  Troszak testified that Cedar Funding booked Loan 1 at 13% rather than the 14% rate indicated on the face of Loan 1.  He also testified that Cedar Funding's records consistently indicated that loans secured by first deeds of trust, such as Loan 1, accrued interest at 13% per annum.  The Trustee further conceded at trial that neither Loan 1 nor DOT 1 authorized the Extension Fees.

Def's Exh. IF, generated by Troszak, provides an accounting of Loan 1 that (a) removes all Extension Fees and the interest that accrued on these fees; (b) calculates all accrued interest at 13%; and (c) calculates interest on actual drawdowns, rather than the Loan 1 face amount.  Based on this evidence

negotiations about the claim" is not admissible to prove or disprove the validity or amount of a disputed claim.  Accordingly, evidence of the settlement negotiations is only admissible to establish that such negotiations did, in fact, occur.

[11]  No party disputes that all of the Loans had matured and were due and owing.

[12]  As noted above, the Trustee did not record reconveyances releasing the Non-Reconveyed Lots from DOT 2 at the Plaintiff's request.

9

1 the court determines that the Loan 1 outstanding balance as of March 1, 2012 is $2,734,404.04.[13]

## LOAN 3 BALANCE

Troszak testified that Cedar Funding's books and records consistently booked loans secured by junior liens, such as Loan 3, at 14% per annum. Loan 3, on its face, indicates the interest rate on the note is 14%. The court finds Troszak to be a credible witness, and it therefore determines that the Loan 3 interest rate is 14%.

Frederick testified that Cedar Funding mistakenly debited Loan 3 draws that should have been attributed to Loan 4, which resulted in a $170,000 Loan 3 overdraw (Trial Tr. 190, 18-25. 191:1-20 (Feb. 27, 2012)). Plaintiff did not provide the court with sufficient evidence to find that an accounting error caused the overdraw.

Def's Exhibit IF, generated by Troszak, provides an accounting of Loan 3 at 14% interest, with interest calculated on actual drawdowns, rather than its face amount. Based on the evidence presented at trial, the court determines that the Loan 3 balance as of March 1, 2012 is $1,561,449.47.

## THE SLANDER OF TITLE CLAIMS

The elements of the tort of slander of title are: (1) a publication, (2) which is without privilege or justification, (3) which is false, and (4) which causes direct and immediate pecuniary loss." *Dubose v. Suntrust Mortg., Inc.*, 2012 WL 1376983, *at 3 (N.D. Cal. April 19, 2012); *Manhattan Loft, LLC v. Mercury Liquors, Inc.*, 173 Cal. App. 4th 1040, 1051, 93 Cal. Rptr. 3d 457 (2009). Courts typically require that the plaintiff also prove that the publication was done maliciously. *Hilton v. Tomasi*, No. BC3920342011, 2011 WL 5084984, at *11 (Cal Ct. App. Oct. 27, 2011); *see also Southcott v. Pioneer Title Co.*, 203 Cal. App. 2d 673, 676, 21 Cal. Rptr. 917 (1962) (stating that slander of title is "a tortious injury to property resulting from unprivileged, false, malicious publication of disparaging statements regarding the title to property owned by plaintiff"). Malice may be actual or implied. *Gudger v. Manton*,

---

[13] Plaintiff's accounting of the Loan 1 balance as of March 1, 2012 was $2,619,001.66. (Trial Tr. 380, 381:1-17 (Feb. 28, 2012)).

Case: 09-05173   Doc# 134   Filed: 08/06/12   Entered: 08/06/12 16:54:41   Page 10 of 22

21 Cal.2d 537, 544 (1943).

Plaintiff's slander of title claims arise from the Trustee's March 2009 initiation of nonjudicial foreclosure proceedings. These claims are best described as slander of title arising from a "wrongful foreclosure."

Nonjudicial foreclosure sales are governed by Cal. Civ. Code § 2924. *Castaneda v. Saxon Mortg. Serv's., Inc.*, 687 F.Supp.2d 1191, 1201 (E.D. Cal. 2009);. *Moeller v. Lien*, 25 Cal.App.4th 822, 834, 30 Cal. Rptr. 2d 777 (1994). California's nonjudicial foreclosure statute provides a "comprehensive framework for the regulation of a nonjudicial foreclosure sale pursuant to a power of sale contained in a deed of trust." *Lona v. Citibank, N.A.*, 202 Cal. App. 4th 89, 102, 134 Cal. Rptr. 3d 622 (2011); *Moeller v. Lien*, 25 Cal.App.4th 822, 834, 30 Cal. Rptr. 2d 777 (1994). Courts typically analyze "wrongful foreclosure" slander of title claims within the framework of Cal.Civ.Code § 2924. *Smith v. Onewest Bank Group*, No. B234037, 2012 WL 2560258, at *5 (Cal. Ct. App. July 03, 2012); *Kachlon v. Markowitz*, 168 Cal. App. 4th 316, 333, 85 Cal. Rptr. 3d 532 (2008). The "slander" herein arose from the recordation of the "Notices of Default" required by Cal. Civ. Code § 2924(a)(1). These default notices communicated to third-parties that Plaintiff was in breach of its obligations under Loans 1 and 3 and DOTs 1 and 3.

The recordation of Notices of Default is protected, however, by California's broad litigation privilege. Under Cal. Civ. Code § 2924(d) "(1) The mailing, publication, and delivery of notices as required by this section, (2) Performance of the procedures set forth in this article . . [and] notices or communication issued in the course of performing duties related to non-judicial foreclosure sale" are privileged communications pursuant to Cal. Civ. Code § 47. *Smith v. Commonwealth Land Title Ins. Co.*, 177 Cal. App. 3d 625, 630, 223 Cal. Rptr. 339 (1986) ("A privilege, either absolute or qualified, is a defense to a charge of slander of title.")

Cal. Civ. Code § 47 may provide an absolute or qualified privilege. Cal. Civ. Code § 47(b) provides that a publication or broadcast made "in the proper discharge of an official duty . . . any . . . . judicial proceeding . . . or in any other official proceeding authorized by law" is absolutely privileged. Section 47(c) of the Civil Code provides a qualified privilege for a "communication, **without malice**, to a person interested therein, (1) by one who is also interested, or (2) by one who stands in such a

11

relation to the person interested as to afford a reasonable ground for supposing the motive for the communication to be innocent, or (3) who is requested by the person interested to give the information."(emphasis added). Some courts have held that any act taken by a trustee in furtherance of a non-judicial foreclosure sale is absolutely privileged under § 47(b), obviating the need to establish malice. *See, e.g., Dubose v. Subtrust Mortg. Inc.*, No. 5:11-CV-032642012, 2012 WL 1376983, at *2 (N.D. Cal. April 19, 2012); *Lipscomb v. Mortgage Electronic Registration System, Inc.*, No. 1:11–CV–497, 2011 WL 3361132, at *5 (E.D. Cal. Aug 03, 2011); *Lykkeberg v. Bank of America, N.A.*, No. C 12–00772, 2012 WL 1099773, at *3 (N.D. Cal. Apr 02, 2012); *Garretson v. Post*, 156 Cal. App. 4th 1508, 68 Cal. Rptr. 3d 230 (2007). Other courts have found that the qualified privilege of § 47(c) applies to a "wrongful foreclosure" slander of title claim, since a "nonjudicial foreclosure is a private procedure involving private parties . . . [b]y definition, it does not occur in a judicial proceeding." *Kachlon v. Markowitz*, 168 Cal. App. 4th 316, 85 Cal. Rptr. 3d 532 (2008); *see also Boggs v. Wells Fargo Bank NA*, No. C 11–2346, 2012 WL 2357428, at *4 (N.D. Cal. Jun 14, 2012); *Smith v. Quality Loan Service Corp.*, No. Civ S–11–2108, 2012 WL 202055, at *3 (E.D. Cal. Jan 23, 2012); *Consumer Solutions REO, LLC, v. Hillery*, 658 F. Supp.2d 1002, 1018 (N.D. Cal. 2009); *Milyakov v. JP Morgan Chase Bank, Nat. Associations*, No. C 11–02066, 2011 WL 3879503 (N.D. Cal. Sep. 20, 2011). Most courts in California, take the *Kachlon* approach. This court also elects to follow *Kachlon*'s reasoning. Furthermore, "Malice is defined as actual malice, meaning that the publication was motivated by hatred or ill will towards the plaintiff or by a showing that the defendant lacked reasonable grounds for belief in the truth of the publication and therefore acted in reckless disregard of the plaintiff's rights." *Kachlon*, at 336.

The Trustee did not act maliciously when he commenced foreclosure proceedings against the Lots. The bankruptcy estate spent hundreds of thousands of dollars attempting to locate, unravel and then piece together Cedar Funding's financial books and records. Cedar Funding's records were, at best, in shambles when it filed its Chapter 11 bankruptcy. Under these circumstances, it is not surprising that, despite his best efforts, the Trustee's Notices of Default may have misstated the amount due under Loans 1 and 3. The fact that the Plaintiff and the Trustee disagreed on the loan balances does not mean that the Trustee acted maliciously. Plaintiff did not offer any evidence that the Trustee maliciously relied

12

on his professionals' loan balance calculations when he authorized the recordation of the Notices of Default.

Furthermore, The Trustee engaged in substantial negotiations with Plaintiff soon after he was appointed to reconcile the amounts due under Loans 1 and 3. When these talks failed, the Trustee only then authorized the recordation of the Notices of Default. Finally, even if the Trustee's accounting was imperfect, Plaintiff was in default under Loans 1 and 3 in May 2009. The Trustee's conduct was not motivated by ill will, and the Trustee reasonably believed that Loans 1 and 3 were in default. Accordingly, the recordation of the Notices of Default was privileged conduct under Cal. Civ. Code § 47(c), and this court finds in favor of the Trustee on the Plaintiff's slander of title claims for relief.

**THE CIVIL CODE § 2943 CLAIMS**

California Civil Code § 2943(c)(1) provides in relevant part that "A beneficiary, or his or her authorized agent, shall, on the written demand of an entitled person, or his or her authorized agent, prepare and deliver a payoff demand statement to the person demanding it within 21 days of the receipt of the demand." Section 2943 defines a "payoff demand statement" as "a written statement, prepared in response to a written demand made by an entitled person or authorized agent, setting forth the amounts required as of the date of preparation by the beneficiary, to fully satisfy all obligations secured by the loan that is the subject of the payoff demand statement." Cal. Civ. Code § 2943(a)(5). "Delivery" of a payoff demand statement is defined as "depositing or causing to be deposited in the United States mail an envelope with postage prepaid, containing a copy of the document to be delivered, addressed to the person whose name and address is set forth in the demand therefor. The document may also be transmitted by facsimile machine to the person whose name and address is set forth in the demand therefor." Cal. Civ. Code § 2943(a)(3).

If a beneficiary[14] fails to deliver a payoff demand statement in the prescribed 21-day period "he or she is liable to the entitled person for all damages which he or she may sustain by reason of the

---

[14] Under § 2943(a)(1) a "beneficiary" means a "mortgagee or beneficiary of a mortgage or deed of trust, or his or her assignees." Cedar Funding was the beneficiary under the loans in question.

13

refusal." Cal. Civ. Code § 2943(e)(4). Any failure to deliver the payoff demand must be done "willfully." Id. The statute defines "willfully" as "an intentional failure to comply with the requirements of this section without just cause or excuse." Id.

On December 11, 2007, Cedar Funding provided Stewart Title with a payoff demand statement for Loan 1. *See* P's Exh. 22. Setting aside its dissatisfaction with the accuracy of the demand statement, Plaintiff has not advanced any argument that this document did not comply with Civil Code § 2943. Frederick testified that she met with David Nielsen several times in February 2008 and requested that he issue another beneficiary demand. Her meetings yielded one document dated February 21, 2008, which Cedar Funding mailed to Frederick (Trial Tr. 196:21-22, 197:18-22 (Feb. 27, 2012)). This document satisfied the relevant criteria of a "payoff demand statement" with respect to Loan 3(P's Exhibit 24). Frederick testified that she also met with Cedar Funding in March 2008, again requesting that it issue payoff demand statements on Notes 1 and 3. (Trial Tr. 196:15-18 (Feb. 27, 2012)). Cedar Funding complied with her verbal request, this time handing her a document, dated March 11, 2008, stating the Loans 1 and 3 balances (P's Exh. 25). B(Trial Tr. 211:19-22 (Feb. 27, 2012).[15] While this document was not mailed or faxed and thus was not a "payoff demand statement" recognized by Cal. Civ. Code § 2943(a)(3), Frederick's demand was verbal, not written, and thus did not trigger a response under Cal. Civ. Code § 2943(a)(3). Moreover, there is no evidence that Frederick ever sent Cedar Funding a written demand for a payoff demand statement(as required under Cal. Civil Code § 2943(c)(1))after Stewart Title sent its December 11, 2007 payoff demand statement. The evidence indicates that all of Frederick's requests for a payoff demand statement were either made in person or by telephone. There is no evidence that during the relevant period, Frederick ever made such a demand in writing as required by statute.

Susan Clark, the Stewart Title employee responsible for Plaintiff's refinance efforts, testified that Stewart Title typically would send a written request to a lender for a "beneficiary demand" after which Stewart Title would typically receive the requested beneficiary demand. (Trial Tr. 48:19-25, 49:1-20

---

[15] Plaintiff identified its own Exhibit 24 as "Cedar Funding 2/21/08 *payoff demand* (Loan 3) for $600,000"and Exhibit 25 as "Cedar Funding 2/21/08 *payoff demand* (Loan 3) for $600,000" (emphasis added).

Case: 09-05173   Doc# 134   Filed: 08/06/12   Entered: 08/06/12 16:54:41   Page 14 of 22

1  (Feb. 27, 2012.))  She also testified that Stewart Title typically would not fax its demand, but instead

2  send them by first class mail or some other form of delivery. Id.  Clark also testified that she recalls

3  making one such written beneficiary demand request, but she could not recall when she made the

4  request. (Trial Tr. 50:18-25, 51:1-5 (Feb. 27, 2012)).  She also testified that she might have made

5  additional requests by phone, but again, she could not recall when she made these additional requests.

6  Id.

7  Stewart Title provided no documentary evidence of sending a written payoff demand request to

8  Cedar Funding after December 2007, and the evidence indicates that Cedar Funding properly delivered

9  a payoff demand statement to Stewart Title in response to this one written demand.  Nor did Cedar

10  Funding's records contain any evidence of any other written demand from Stewart Title.  Given these

11  facts, the court cannot find that Stewart Title sent a written request to Cedar Funding for a payoff

12  demand statement after December 2007, and that Cedar Funding failed to provide a payoff demand

13  within the required 21 day period.

14  Finally, even if Plaintiff or Stewart Title had issued written beneficiary demand requests after

15  December 2007 and Cedar Funding's responses were inadequate under Civil Code § 2943, failure to

16  timely deliver a payoff demand must be "intentional" and "without just cause or excuse." Cal. Civ. Code

17  § 2943(e)(4).  The court does not believe that Cedar Funding's alleged failures were intentional or

18  without just cause or excuse  In early 2008, Cedar Funding was in the midst of litigation, a Department

19  of Real Estate investigation, and a significant cash crisis, all of which may have distracted Cedar

20  Funding from responding to Plaintiff and Stewart Title's alleged beneficiary demand requests.  Frederick

21  also testified that Cedar Funding itself wanted to refinance Loan 3 because of its cash flow problems.

22  This testimony also undermines Plaintiff's argument that Cedar Funding - which desperately needed the

23  cash to perpetuate its Ponzi scheme - willfully and intentionally ignored its obligations under Civil Code

24  § 2943. (Trial Tr. 214:13-25, 215-217:1-6.(Feb. 27, 2012)). Accordingly, Plaintiff has not established

25  liability under Cal. Civ. Code § 2943(e)(4).

26

27  **THE § 2941 CLAIMS.**

28  Plaintiff argues that California Civil Code § 2941(b)(1) entitles it to recover damages flowing

15

from Cedar Funding's failure to timely record partial releases of the Non-Reconveyed Properties from DOTs 1 and 2 following the partial payments.

Section 2941(b)(1) requires the beneficiary of a deed of trust to "execute and deliver to the trustee the original note, deed of trust, request for a full reconveyance, and other documents as may be necessary to reconvey, or cause to be reconveyed, the deed of trust" within 30 days of a borrower having satisfied its obligations under a deed of trust. Cal. Civ. Code § 2491(b)(1). Failure to timely reconvey "shall make the violator liable to the person affected by the violation for all damages which that person may sustain by reason of the violation, and shall require that the violator forfeit to that person the sum of five hundred dollars." Cal. Civ. Code § 2491(d).

### THE OBLIGATION TO RECORD PARTIAL RECONVEYANCES.

Before the court may award damages under Cal.Civ. Code § 2941(d), it must determine whether Cedar Funding was required to release individual Lots from DOTs 1 and 2 upon Plaintiff's partial loan payments.

California courts uphold agreements that provide for the release of specific lots from a blanket lien encumbering multiple lots. *Vilkin v. Sommer*, 260 Cal. App. 2d 687, 67 Cal. Rptr. 837 ( 1968); *see also* Miller & Starr, Cal. Real Estate (3rd ed. 2000) § 10:119. Such agreements allow borrowers to refinance or sell individual lots without fully satisfying the outstanding note balance. The actual release of a particular parcel or lot is accomplished by a "partial reconveyance" of a portion of the encumbered premises. *Id.*

Loans 1 and 2 and DOTs 1 and 2 do not contain "release clauses" or any language that could be construed to impose such an obligation on Cedar Funding. In fact, the language contained in Loans 1 and 2 regarding lien releases explicitly contemplates a release only upon payment in full. Thus, any partial reconveyance agreement would constitute a modification of the applicable loan documents.

Under California law, "a contract, promise, undertaking, or commitment to loan money or to grant or extend credit, in an amount greater than one hundred thousand dollars ($100,000), not primarily for personal, family, or household purposes, made by a person engaged in the business of lending or arranging for the lending of money or extending credit" is subject to the statute of frauds. Cal. Civ. Code

16

§ 1624 (7).[16] *See also, Secrest v. Security National Mortgage Loan Trust 2002–2*, 167 Cal. App.4th 544, 552, 84 Cal. Rptr. 3d 275 (2008). Modifications to agreements within the statute of frauds are also subject to the statute of frauds. Cal. Civ. Code § 1698 (a). Moreover, oral modifications are permitted if the parties have performed the oral agreement. *Id.*

Here, Cedar Funding's payoff demands[17] satisfied the Statute of Frauds. California law is clear that "a note or memorandum under the statute of frauds need not contain all of the details of an agreement between the parties." *Lamle v. Mattel, Inc.*, 394 F.3d 1355, 1361 (9th Cir. 2005) (*quoting Gold Seal Prods., Inc. v. RKO Radio Pictures, Inc.*, 134 Cal. App.2d 843, 286 P.2d 954, 967 (1955). Rather, the statute only requires that "every material term of an agreement within its provisions be reduced to written form." *Burge v. Krug*, 160 Cal.App.2d 201, 325 P.2d 119, 123 (1958). "If the court, after acquiring knowledge of all the facts concerning the transaction which the parties themselves possessed at the time the agreement was made, can plainly determine from the memorandum the identity of the parties to the contract, the nature of its subject matter, and its essential terms, the memorandum will be held to be adequate." *Kaneko v. Okuda*, 195 Cal. App.2d 217, 230, 15 Cal. Rptr. 792 (1961) (*citing Brewer v. Horst & Lachmund Co.*, 127 Cal. 643, 60 P. 418, 419 (1900)). Cedar Funding's payoff demands contain all the material terms of a partial reconveyance agreement: (a) a stated payoff amount of $450,000 and (b) representations that Cedar Funding would release Lots 2, 3 and 6 (translating to 7 Spray, 15 Spray, and 17 Spray) from DOTs 1 and 2 upon payment. Each of these three payoff demands were signed by a Cedar Funding representative. The court finds that valid partial reconveyance agreements existed regarding 7 Spray, 15 Spray and 17 Spray, which required Cedar Funding to record partial reconveyances upon payment.

---

[16] At trial, Cedar Funding did not raise the statute of frauds as a defense to the purported reconveyance agreements. Cedar Funding denied the existence of any such agreements, however, in its answer. A general denial of the existence of such an agreement in an answer without reference to the statute of frauds is sufficient to preserve a statute of frauds defense. *Secrest* at 552.

[17] P's Exhibits 17, 18, 19.

17

While Cal.Civ. Code § 2941(b) authorizes the recovery of damages when a party has breached a *contractual* duty to reconvey a deed of trust, courts have consistently held that § 2941(d) ("all damages which that person may sustain by reason of the violation") is based on a tort theory of damages. *See Pintor v. Ong* ,211 Cal. App. 3d 837, 841, 259 Cal. Rptr. 577 ("An action under § 2941 sounds in tort rather than contract because it seeks damages for violation of a statutory duty."); *see also, Cairns v. Johnson*, No. E041361, 2007 WL 2601862 (Cal. Ct. App. Sept 11, 2007); *State ex rel. Bowen v. Bank of America Corp.*, 126 Cal. App 4th 225. 23 Cal. Rptr. 3d 746 (2005); *Panagotacos v. Bank of America*, 60 Cal. App. 4th 851, 70, Cal. Rptr. 2d 595 (1998). These cases do not indicate, however, how to measure those tort like damages.

Damages awarded for slander of title provide a useful analogy when calculating an award under Cal.Civ. Code § 2941(b). In a slander of title action, a party impairs the ability to market real property due to some form of improper or unauthorized conduct. "[P]rotection from injury to the salability of property is the thrust of the tort." *Howard v. Schaniel*, 113 Cal.App.3d 256, 263–264, 169 Cal. Rptr. 678. (1980). Slander of title typically involves a party filing encumbrances against real property (or creating the impression that such encumbrances exist) without justification or authorization, thereby thwarting the sale of the real property. Slander of title damages consist of a party's pecuniary loss from his impaired ability to sell the encumbered property (*Ukwuoma v. Marine*, No. 87-6357, 1990 WL 95396, at *3 (9th Cir. July 11, 1990)). Such damages closely resemble the damages caused by the failure to remove or reconvey a lien such as a deed of trust. In a slander of title action, the only offense is the imposition of an improper lien; here, the offending act is the failure to remove a lien. The result is the same: an encumbrance which should not exist. Given that the misconduct and resulting harm in § 2941 and slander of title actions are nearly identical, the method of calculating damages should equally coincide. California courts have adopted the Restatement of Tort's definition of pecuniary damages for calculating slander of title awards. *See Appel v. Burman* 159 Cal. App.3d 1209, 1215, 206 Cal. Rptr. 259 ( 1984); *Howard v. Schaniel*, 113 Cal. App. 3d, 256, 263, 169 Cal. Rptr. 678 (1980). *See also Gudger v. Manton* 21 Cal.2d 537 (1943) (disapproved on other grounds in *Albertson v. Raboff,* 46 Cal. 2d 375, 381 (1956)). The Restatement of Torts defines slander of title damages as "loss caused by prevention

18

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

of a particular sale" and "loss caused by deprivation of opportunity to sell to a particular purchaser. Restatement (Second) of Torts § 633, cmt. ©, (d). (1977). Damages are measured by "the difference between the price that would have been realized by [the sale] and the salable value of the thing in question after there has been a sufficient time following the frustration of the sale to permit its marketing." Restatement (Second) of Torts § 633, cmt. (e). In this instance, Plaintiff argues that the Non-Reconveyed Properties — 7 Spray, 15 Spray and 17 Spray — were ultimately lost to foreclosure, so the appropriate measure of damages requires evidence of the "frustrated sales price" or equivalent, less the amounts due on the non-Cedar Funding loans which encumbered the properties.

Plaintiff retained Barbara Nichols as its expert damages witness. Much of her testimony (by declaration or courtroom testimony) was excluded by this court during trial, and this court adopts its rulings made at trial. The court finds that Nichols, a licensed and experienced real estate broker, is competent to opine on the property values offered in Plaintiff's Exhibit 40, and to testify regarding the damages determined by applying the calculation described above. As stated below, however, this court did not necessarily rely on Nichols' testimony to determine Plaintiff's damages.

**7 SPRAY**

While Nichols valued all three Spray properties (through comparables and other documentary evidence typically relied upon by real estate valuation experts) as of May 2008, this court relies on Frederick's testimony to calculate damages for 7 Spray. Frederick testified that in April 2009, she received a $3.325 million offer for 7 Spray. At this time, she believed that she owed approximately $2.36 million on what should have been the first deed of trust against that property, held by San Luis Bank, and a second deed of trust securing a $55,000.00 note held by SLO Capital, Inc. (the court refers the parties to Exhibit 50, the Chicago Title preliminary title report on 7 Spray issued on July 13, 2009). Frederick testified that this sale did not close due to Cedar Funding's failure to reconvey DOTs 1 and 2. Frederick's testimony was convincing. Assuming closing costs of 8%, this court calculates damages

UNITED STATES BANKRUPTCY COURT
For The Northern District Of California

1  relating to 7 Spray in the amount of $644,000.00.[18]

2

3  **15 SPRAY**

4       While Frederick also testified to a lost sale of 15 Spray, this court finds that her recollection of

5  this specific details of this failed transaction less convincing, and thus relies more on Nichols' damages

6  testimony. Frederick testified that sometime in the summer of 2008, she received a $2.75 million offer

7  for 15 Spray. Unlike the 7 Spray sale, she could not provide a specific month when the offer was made,

8  had no documentation regarding this sale and did not provide any evidence of a title report having been

9  prepared in anticipation of this sale. Frederick also did not testify regarding the amount of the non Cedar

10 Funding secured debt against 15 Spray. Frederick did testify, however, that this sale did not close due

11 to Cedar Funding's failure to reconvey DOTs 1 and 2. Nichols' testimony (i.e., Plaintiff's Exhibit 40)

12 provides this court with sufficient evidence to determine Frederick's damages arising from this lost

13 transaction. Nichols valued 15 Spray in May 2008 at 1.725 million dollars, and estimated the non Cedar

14 Funding secured debt at $750,00.00. Again, assuming closing costs of 8%, Frederick's damages arising

15 from this failed sale was $837,000.00.

16

17 **17 SPRAY**

18      The court does not award any damages relating to 17 Spray. While 17 Spray wrongfully

19 remained encumbered by DOTs 1 and 2, this court does not have sufficient evidence to determine

20 damages. Frederick did not provide the specifics of any attempt to sell 17 Spray other than an "equity

21 sale" in late 2009 (or later) that generated some unknown amount of cash. Moreover, in Plaintiff's

22 Exhibit 40, Nichols valued 17 Spray as of May 2008, well before Frederick's "equity sale." The real

23 estate market changed dramatically in that year, and this court declines to rely on Nichol's May 2008

24 valuation.

25

26     [18]    While Nichols provided her own appraisal of 7 Spray apparently independent of this
$3.325 million sale, and also provided a different amount due under the non-Cedar Funding deeds of

27 trust, this court finds that Frederick's unambiguous testimony and the Chicago Title preliminary

28 report to be more persuasive evidence.

## STATUTORY DAMAGES UNDER § 2941(D)

Cal.Civ. Code § 2941(d) provides a statutory remedy of $500 for any violation of the statute. In this case, the court finds that Cedar Funding failed to record partial reconveyances of DOT 1 and DOT 2, as it was obligated to do, following receipt of the payoff amounts on Loans 1 and 2 for 7 Spray, 15 Spray and 17 Spray. Given that there were six separate violations of § 2941(b), Plaintiff is hereby awarded statutory damages of $3,000.

## SETOFF OF PLAINTIFF'S DAMAGES AGAINST AMOUNTS OUTSTANDING ON LOAN 1 AND LOAN 3

The Trustee concedes that Plaintiff may setoff any damages award against the amounts due under Loans 1 and 3. *See* Def's Post Trial Brief, p. 4 [D.N.# 124] ("Plaintiff is entitled to assert its damages, as may be found by the Court, as an offset to the amount that it owes the Debtor"). Accordingly the aggregate amount outstanding on Loans 1 and 3 shall be reduced by $1,481,000 plus $3,000 in statutory damages.

## CONCLUSION

For the reasons explained, judgment is (a) granted in favor of the Trustee on the counterclaims regarding the amounts outstanding on Loans 1 and 3 (as set forth above); and (b) granted in favor of the Plaintiff against the Trustee regarding its claims under Cal. Civ. Code §2941 in the amount of $1,481,000. The aggregate amount outstanding on Loans 1 and 3 shall be reduced by this amount. The parties are directed to confer and submit a judgment consistent with this decision.

**\* \* \* END OF ORDER \* \* \***

21

**COURT SERVICE LIST**

2

3

4  Carol Frederick
   Manager ULTIPRF,LLC
5  316 Mid Valley Center #142
   Carmel, CA 93923

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**UNITED STATES BANKRUPTCY COURT
For The Northern District Of California**